STATE OF NEW JERSEY, PLAINTIFF, v. FRANCIS MURPHY, MICHAEL McNAMARA, AND EARLE S. STEVENS, DEFENDANTS.

Hudson County Court
Law Division — Criminal

Decided September 29, 1960.

*Mr. David D. Furman,* Attorney General (*Mr. Charles S. Joelson,* Deputy Attorney General, appearing), attorney for plaintiff.

*Messrs. Krieger & Chodash,* attorneys for defendant Michael McNamara (*Mr. Harold Krieger,* appearing).

*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys for defendant Earle S. Stevens (*Mr. James A. Hession,* appearing).

*Mr. Robert A. Pinn,* attorney for the Waterfront Commission of New York Harbor, appearing with *Mr. William P. Sirignano,* of the New York Bar, general counsel.

ROSEN, J. C. C. The Waterfront Commission of New York Harbor (hereinafter referred to as "Commission") moves to quash a subpoena *duces tecum* issued *sua sponte* by the court pursuant *to R. R.* 3:5–10(*c*).

A review of the complete factual situation is required in order to determine the merits of the application.

Defendants McNamara and Stevens were indicted for the crime of conspiracy in that they, together with nine other persons not indicted, unlawfully, willfully, and knowingly, conspired together to cheat and defraud American Export Lines, Inc., by causing American Export Lines to pay wages to persons for dates on which they performed no labor or services. Examination of the indictment reveals that there are five overt acts charged against these defendants to effect the objects of the conspiracy. The alleged acts occurred between March 16, 1959 and May 14, 1959.

Defendant Stevens is general superintendent in charge of Stevedoring of American Export Lines. Defendant McNamara is a hiring agent, duly licensed by the Commission.

The Commission conducted an investigation of the activities of the named defendants as well as other persons named in the indictment. During the course of the investigation defendants testified before the Commission and a stenographic record was taken. The facts gathered by the Commission in its investigation, including the transcripts of McNamara's and Stevens' testimony, were forwarded to the Attorney General of this State, who presented the matter to the grand jury of Hudson County. On June 29, 1959 the indictment was found against the named defendants. The transcripts of defendants' testimony have been returned to the Commission by the Attorney General.

The indictment alleges, in substance, the same facts as are involved in charges pending against McNamara before

the Commission. Defendants McNamara and Stevens applied to this court for an order dismissing the indictments on the ground that the same were insufficient as a matter of law or, in the event that the indictments were sustained, that an order be made directing the Attorney General (who was acting as prosecutor in this matter) to permit the said defendants to inspect and copy or photograph written statements made by them. The application also requested the court to relax the rules and direct the prosecutor to permit the defendants to inspect and copy written statements of another defendant, Francis Murphy, and the nine individuals (non-defendants), who are alleged in the indictment to have been co-conspirators with the defendants. They also requested copies of the statements, notes and memoranda made by other persons whom the prosecutor intends to offer as witnesses at the trial. In answer to defendants' request to obtain copies of or inspect their testimony before the Commission, the Attorney General in his memorandum stated: "The State will not object to furnishing the defendant, Earle S. Stevens, with a transcript of his own testimony before the Waterfront Commission," but would object to furnishing defendant with statements of any other persons in the form of testimony before the Commission. Prior to oral argument the State submitted a supplement to its original memorandum and informed the court: "The State has been informed by officials of the Waterfront Commission that its rules and regulations prohibit the furnishing of such transcripts of testimony. In view of this fact, the State will agree that at the trial of the defendant, Earle S. Stevens, it will not mark into evidence, or in any way use the transcript in question against the defendant." This is the same position the State took as to defendant McNamara. At oral argument, the Deputy Attorney General frankly informed the court that if he had possession of the transcripts he would permit each defendant to obtain a copy of his own testimony before the Commission.

On November 23, 1959 the court denied defendants' motion for an order dismissing the indictments. Defendants' application for an order relaxing *R. R.* 3:5–11 to permit them to obtain copies of statements and other memoranda made or given to the Commission by persons other than these two defendants was denied. The application to permit defendants or their respective attorneys to inspect, copy or photograph their own testimony or written statements, including notes of interviews or memoranda in connection therewith, obtained from defendants, was granted. The Attorney General furnished the Commission with a copy of the order and requested the Commission to cooperate with counsel for defendants in complying with the provisions of the order. The Commission advised the Attorney General that it declined to comply with his request. Annexed to the Commission's letter to the Attorney General was an opinion by the Commission wherein, among other things, it stated:

"Further, with respect to the closely analogous question whether a defendant in a criminal case is entitled to pretrial production of his statements or confession, the prevailing rule is that no such right exists. In New Jersey the Supreme Court reversed a decision by the trial court to grant pretrial production of a confession to a criminal defendant. *State v. Tune,* 13 *N. J.* 203 (1953)."

Defendant Stevens filed an affidavit setting forth details of his employment. He stated he had been interviewed at the Commission's office by representatives of the legal and investigatory staffs of the Commission on at least four occasions, from May 14, 1959 to June 4, 1959. During the course of these interviews notes were made by one or more members of the Commission, and on some occasions questions and answers, given under oath, were taken by a stenographer. Stevens specifically states, in discussing this matter with his attorney, he cannot recall details of the statements or of his answers under oath, and he has never seen a transcript of his statements. Counsel for Stevens, in this affidavit, states, in his judgment, that an inspection

of this defendant's testimony, statements, *etc.*, is necessary to properly prepare for trial, and that a denial of such inspection would result in an injustice or undue hardship to the defendant. It was stipulated the McNamara application would be considered upon the same facts as set forth in the Stevens' application.

After being advised by the Attorney General that the Commission refused to comply with the order of this court, the court designated a date certain for a pretrial conference, and issued a subpoena *sua sponte* directing the Commission to produce

"The transcripts of the testimony of the defendants, Michael McNamara and Earl S. Stevens, given before your commission, including any and all other written statements and notes of interviews of each of the said defendants, or memoranda in connection therewith, if any, obtained by your representatives, employees or agents, from each of said defendants."

The Commission moved to quash the subpoena on the grounds that (1) the instant subpoena is not authorized by the rules of criminal practice; (2) Commission Regulation 1.3 validly prohibits the production of the Commission's transcripts of testimony; (3) the instant subpoena is violative of the sovereign immunity enjoyed by the Waterfront Commission as an agency of the States of New York and New Jersey; and (4) the Commission's transcripts of testimony are privileged from production under the common law rules of evidence.

Many provisions of the Waterfront Commission Act have been reviewed by the courts of this State. *In re Application of Waterfront Comm.*, 32 *N. J.* 323 (1960); *Hazelton v. Murray*, 21 *N. J.* 115 (1956); *Application of Waterfront Comm. of New York Harbor*, 39 *N. J. Super.* 33, 41 (*Law Div.* 1956). The Waterfront Commission compact creates the Commission *as an agency* of the states of New Jersey and New York, 32 *N. J.*, at *p.* 331.

The court is not impressed with the Commission's argument that the prosecutor has agreed not to mark into evi-

dence or "in any way use the transcripts in question against the defendants." The prosecutor represents the community and society. It is his duty to present and use all evidence within his knowledge and possession in order to vigorously present a case against a defendant. It is not for him to decide that evidence previously given by a defendant is not to be used at a trial in which the same defendant is accused of a crime. If defendant has given statements under oath or otherwise, which are admissions against his interest, then the statements should be used by the State at the trial. Admissions against interest are usually a vital link in the presentation of the State's case against a defendant.

"In the first place, any and every statement by an accused person, so far as not excluded by the doctrine of confessions or by the privilege against self-crimination, is usable against him as an admission. * * * Statements of design or plan as already noticed are in general admissible, so far as the design or plan is relevant to show the doing of the act designed." *Wigmore on Evidence* (3d ed.), § 1732, *p.* 99.

If the statements given by defendants to the Commission do not contain admissions, then the State should have the benefit of defendants' testimony and statements for cross-examination should they take the stand. Cross-examination has long been considered the spearhead for the disclosure and attainment of the truth. The use of prior testimony and statements of a defendant has always been basic in the art of cross-examination if such statements are inconsistent with the testimony given by a defendant at the trial.

"Cross-examination is the most valuable safeguard that has been discovered in the judicial search for truth, and if cross-examination is to be at all effective, it must have wide latitude in the testing of the recollection and fidelity of the witness." *State v. Hunt,* 25 *N. J.* 514, 524 (1958)

The people of the state have a right to demand and expect efficient law enforcement. To attain this goal, the proper presentation and prosecution of criminal matters is

imperative. A prosecutor cannot waive, release or relinquish this public right. In *State v. Johnson*, 31 *N. J.* 489, 511 (1960), Justice Proctor stated:

"The Prosecutor, however, does represent the government and people of the State, and it is fair to say that the members of the jury have confidence that he will fairly fulfill his duty to see that justice is done, whether by conviction of the guilty or acquittal of the innocent."

*R. R.* 3:5–10 (formerly *Rule* 2:5–8(*c*)) provides as follows:

"(c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or other objects designated in the subpoena be produced before the court *at a time prior to the trial* or prior to the time when they are to be offered in evidence, and may upon their production permit the books, papers, documents, or objects or portions thereof, to be inspected and copied by the parties and their attorneys." (Emphasis supplied)

This rule is derived from and is almost identical with *Rule* 17(*c*) of the *Federal Rules of Criminal Procedure*. In *Bowman Dairy Co. v. United States*, 341 *U. S.* 214, 220, 221, 71 *S. Ct.* 675, 95 *L. Ed.* 879 (1951), the Supreme Court defined the purpose of *Rule* 17(*c*):

"It was not intended by *Rule* 16 to give a limited right of discovery, and then by *Rule* 17 to give a right of discovery in the broadest terms. *Rule* 17 provided for the usual subpoena *ad testificandum* and *duces tecum*, which may be issued by the clerk, with the provision that the court may direct the materials designated in the subpoena *duces tecum* to be produced at a specified time and place for inspection by the defendant. *Rule* 17(*c*) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials. *United States v. Maryland & Virginia Milk Producers Assn.*, D. C., 9 *F. R. D.* 509. However, the plain words of the Rule are not to

be ignored. They must be given their ordinary meaning to carry out the purpose of establishing a more liberal policy for the production, inspection and use of materials at the trial. There was no intention to exclude from the reach of process of the defendant any material that had been used before the grand jury or could be used at the trial. In short, any document or other materials admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena. It was material of this character which the Government was unwilling to stipulate to produce or to produce in obedience to the subpoena. Such materials were subject to the subpoena. Where the court conludes that such materials ought to be produced, it should, of course, be solicitous to protect against disclosures of the identity of informants, and the method, manner and circumstances of the Government's acquisition of the materials."

Obviously *Rule* 17(c), the parent of *R. R.* 3:5–10, is not a discovery rule. One of the practical objectives which *Rule* 17(c) sought to accomplish was to provide a means for sifting, in advance of trial, subpoenaed materials in order to expedite the trial. *R. R.* 3:5–10(c) specifically provides that the court may direct the production of designated material at a time prior to the trial and upon that production, permit the material or portions thereof to be inspected or copied by the parties and their attorneys. The issuance of the subpoena *duces tecum* is authorized by the rules of criminal practice.

Regulation 1.3 of the Commission provides:

"Information or documents obtained by members, officers or employees of the Commission in the course of any inspection, examination, investigation or interrogation shall, unless made a matter of public record by the Commission, be deemed confidential. Members, officers and employees are hereby prohibited from making such confidential information or documents available to anyone other than a member, officer or employee of the Commission, *unless the Commission authorizes the disclosure of such information or the production of such documents as not being contrary to the public interest.* A member, officer or employee who is served with a subpoena requiring the disclosure of such information or the production of such documents shall, unless otherwise directed by the Commission, appear as directed by the subpoena and, unless the authorization described in the preceding sentence shall have been given, shall respectfully decline to discuss the information or

produce the documents called for, basing the refusal upon this rule. Any member, officer or employee who is served with such subpoena shall properly advise the Commission of the service of such subpoena, the nature of the information or documents sought, and any circumstances which may bear upon the desirability of making available such information or documents." (Emphasis supplied)

This regulation was promulgated pursuant to the authority granted to the Commission by the Compact:

"To make and enforce such rules and regulations as the commission may deem necessary to effectuate the purposes of this compact or to prevent the intervention or evasion thereof." *N. J. S. A.* 32:23-10.

And the term "compact" is specifically defined to include the Commission's rules and regulations.

" 'Compact' shall mean this compact and rules and regulations lawfully promulgated thereunder." *N. J. S. A.* 32:23-6.

In the discharge of its statutory functions the Commission accumulates a substantial amount of confidential information. The Commission maintains an investigative staff, and the regular reports submitted by the Commission's investigators cover such matters as pilferage, gambling, loansharking, narcotics, smuggling, subversion, *etc.* The information contained in these reports includes criminal records, backgrounds of persons on the waterfront, their associations, the places they frequent, their financial affairs, and their patterns of activities. Moreover, applicants for licenses and registrations must submit information as to their arrests, criminal convictions, use of narcotic drugs, subversive activities, *etc.*, irrespective of the privilege against self-incrimination. In addition, the Commission receives information from highly confidential informants, from law enforcement agencies and bureaus, and from other governmental agencies having an interest in the waterfront. The Commission also receives information in the form of com-

plaints from passengers, consignors, consignees, employees and persons registered or licensed by the Commission.

In summary, it is apparent that the Commission collects a vast amount of information, much of which is of a highly confidential nature. Regulation 1.3 was no doubt promulgated by the Commission, pursuant to its statutory powers, for the needed purpose of making its files confidential. Regulation 1.3, on its face, constitutes a reasonable and lawful exercise of the Commission's rule making power. As appears from the instant case, the Commission, pursuant to its specific statutory powers, often conducts special investigations into matters concerning the waterfront and the activities of its licensees and registrants, which matters and activities may involve criminal conduct.

The Commission exercised its rightful authority and power in directing the defendants to appear and give evidence concerning their activities on the waterfront. Their testimony was forwarded to the Attorney General. While the physical transcripts may not have been used as evidence before the grand jury which returned the indictment against the defendants, the information contained in the transcripts was available in the presentation of the case to the grand jury. Significantly, the Commission is enjoined "To co-operate with and receive from any department, division, * * * or agency of either or both states or of any county, * * * such assistance and data as will enable it properly to carry out its powers and duties * * * and *to request* any such department, division * * * or agency with the consent thereof, to execute such of its functions and powers as the public interest may require." *N. J. S. A.* 32:23–10 (Emphasis supplied)

Under the Waterfront Commission Compact, hiring agents, checkers, longshoremen, and others within the Port of New York District must be licensed or registered by the Commission. By notice of hearing dated January 8, 1959 a proceeding was instituted by the Commission to determine whether to revoke, cancel or suspend the hiring agent's

license of Michael McNamara, defendant herein. The Commission admits the facts set forth in the indictment are essentially the same facts involved in the charges pending against McNamara before the Commission. McNamara requested transcripts of his testimony for his use at the Commission hearing. The Commission ruled against him. The hearing on the charges against McNamara was adjourned by the Commission until after the determination of the criminal case in this State.

The Commission claims that the transcripts of defendants' testimony are material and relevant to its own proceedings, and that any disclosure of these transcripts would adversely affect the pending Commission proceeding. While this conclusion is drawn by the Commission, no facts have been submitted to this court to support the assertion. The defendants do not now seek information which was obtained by the commission from informants, law enforcement officials, governmental agencies, or others; nor do they seek the "work product" of the Commission. It is difficult to understand by what legerdemain of reason, logic, or law a situation can exist which would make the prior testimony of the defendants material and relevant to the commission proceedings, yet *deny* the same defendants a copy of their own testimony and statements at a time when their liberty and freedom are at stake. Professor Wigmore gives forceful argument against the Commission's position.

"The question is then reduced to this, Whether there are any matters of fact, in the possession of officials, concerning *solely the internal affairs* of *public business*, civil or military, which ought to be privileged from disclosure when material to be ascertained upon an issue in a court of justice?

1. Ordinarily, there are not. In any community under a system of representative government and removable officials, there can be no facts which require to be kept secret with that solidity which defies even the inquiries of a court of justice. 'To cover with the veil of secrecy,' said Patrick Henry, 'the common routine of business, is an abomination in the eyes of every intelligent man and every friend to his country.' Such a secrecy can seldom be legitimately desired. It is generally desired for the purposes of

partisan politics or personal self-interest or bureaucratic routine. The responsibility of officials to explain and to justify their acts is the chief safeguard against oppression and corruption. Whether it is the relations of the Treasury to the Stock Exchange, or the dealings of the Interior Department with public lands, the facts must constitutionally be demandable, sooner or later, on the floor of Congress. To concede to them a sacrosanct secrecy in a court of justice is to attribute to them a character which for other purposes is never maintained, a character which appears to have been advanced only when it happens to have served some undisclosed interest to obstruct investigation into facts which might reveal a liability.

2. It is urged, to be sure, that the 'public interest must be considered paramount to the individual interest of a suitor in a court of justice.' As if the public interest were not involved in the administration of justice! As if the denial of justice to a single suitor were not as much a public injury as is the disclosure of any official record! When justice is at stake, the appeal to the necessities of the public interest on the other side is of no superior weight. 'Necessity' as Joshua Evans said, 'is always a suspicious argument, and never wanting to the worst of causes.'

What is the necessity for secrecy in such matters? To justify a privilege, it must be, on settled principles, * * * a secrecy indispensable to induce freedom of an official communication or efficacy in the transaction of official business, and it must further be a secrecy which has remained and would have remained inviolable but for this compulsory disclosure. In how many transactions of official business is there ordinarily such a secrecy?" *Wigmore on Evidence* (3d ed.), § 2378a, *pp.* 789, 790.

■ It must be realized that we have here an asserted privilege created by the Commission itself, and not one enacted by Congress or the Legislature of this State. The secrecy which is now claimed by the Commission would not have remained inviolable but for this compulsory disclosure by subpoena. The Commission made the transcripts available to the Attorney General as head of the Department of Law and Public Safety. This information was the efficient and producing cause of the indictment returned against these defendants. If the Commission had a "privilege" in the first instance, its own actions constitute a waiver of the purported privilege.

Mr. Justice Holmes was the author of an opinion committing the United States Supreme Court to the guardian-

ship of civilized standards in the administration of justice in state criminal trials, thus transforming one of his famous dissents of an earlier day into prevailing doctrine. *Moore v. Dempsey,* 261 *U. S.* 86, 43 *S. Ct.* 265, 67 *L. Ed.* 543 (1923); *Frank v. Mangum,* 237 *U. S.* 309, 345, 35 *S. Ct.* 582, 59 *L. Ed.* 969 (1915). It has been recognized that fair procedure in criminal trials conducted in state as well as federal courts is a civil liberty so fundamental to our democracy that it is covered by the constitutional assurance of "due process." *Konefsky, The Legacy of Holmes and Brandeis, page* 262.

 The basic concept of due process is fair play. If democracy is to survive the menacing challenge of present day totalitarianism, then our belief in the dignity of man must be preserved. The test of our system of legal jurisprudence should be measured by the interest we take in safeguarding the rights of the most despicable criminal. We have bridged the days of trial by inquisition to our present high legal and moral standards in criminal trials by a strong determination to make due process *meaningful.* These efforts should not be thwarted by regulation, no matter how well intended.

In *United States v. Kaskel,* 18 *F. R. D.* 477 (*D. C. N. Y.* 1956), defendant was indicted for the crime of conspiracy and violation of a statute making a false statement with intent to defraud the Federal Deposit Insurance Corporation an offense. Defendant applied for an order under *Rule* 17(*c*) permitting him to inspect and copy the transcript of his testimony taken during a proceeding before the Superintendent of Banks of the State of New York.

The Government opposed the application on the ground that compliance therewith would be unreasonable and oppressive, and violative of the provisions of *section* 36 of the Banking Law of the State of New York, *McKinney's Consol. Laws, c.* 2. The provision of said section which is pertinent to the Government's claim reads as follows (*subd.* 10):

"All reports of examinations and investigations, including any duly authenticated copy or copies thereof in the possession of any banking organization, foreign banking corporation, licensed lender, licensed cashier of checks, or the savings and loan bank of the state of New York, shall be confidential communications, shall not be subject to subpoena and shall not be made public unless, in the judgment of the superintendent, the ends of justice and the public advantage will be subserved by the publication thereof, in which event he may publish a copy of any such report or any part thereof in such manner as he may deem proper."

It was the Government's contention that it received the said transcripts from the Superintendent of Banks specifically and solely for the "Cross examination and confrontation" of the witnesses involved, in the event that they should testify at the trial of the indictment herein, and that it was restricted to such use. It contended also, as hereinabove stated, that compliance with the defendants' demand would constitute a violation of the aforementioned *section* 36 of the Banking Law.

The court, in granting defendant's application to inspect and copy his testimony before the Superintendent of Banks, said:

"However, the situation respecting the Kaskel transcript is quite different. I do not think it will be claimed that the testimony of the defendant Kaskel at the aforementioned hearing is any more inviolable than would be his testimony before a grand jury. Nevertheless, disclosure of the grand jury testimony of a defendant is wholly proper where the ends of justice require it. *United States v. Socony-Vacuum Oil Co.*, 310 *U. S.* 150, 234, 60 *S. Ct.* 811, 84 *L. Ed.* 1129." (18 *F. R. D.*, at *p.* 482)

In *Kaskel* we have an express privilege of confidential communication given to a department in state government by the legislature of that state, but the court ruled that defendant's testimony before the Superintendent of Banks was not inviolable.

*Federal Rule* 17(c) has been construed to permit a defendant to inspect and copy a transcript of his testimony or statements before the Securities and Exchange Commission

when the Commission has forwarded this information and material to the Department of Justice for prosecution. *United States v. Schluter*, 19 *F. R. D.* 372 (*D. C. N. Y.* 1956); *United States v. Berman*, 24 *F. R. D.* 26 (*D. C. N. Y.* 1959); *United States v. Shindler*, 24 *F. R. D.* 142 (*D. C. N. Y.* 1959).

*Rule* 17(*c*) has been liberally interpreted by the federal courts. *Bowman Dairy Co. v. United States, supra; United States v. O'Connor*, 237 *F.* 2d 466, 475, 476 (2 *Cir.* 1956).

In *State v. Johnson*, 28 *N. J.* 133 (1958), it was held that a defendant could obtain a copy of his confession from the prosecutor upon a showing that "he does not recall his statement with sufficient details to satisfy his counsel that he can fairly go to trial without it." The court modified the rule of *State v. Tune*, 13 *N. J.* 203 (1953), by shifting the burden on the State to prove the claim of "extraordinary circumstances" in opposition to defendant's motion for a copy of his own confession.

The basic philosophy of the legal doctrine enunciated in *Johnson* is clearly set forth by Chief Justice Weintraub:

"We start with the premise that truth is best revealed by a decent opportunity to prepare in advance of trial. We have embraced that tenet with respect to civil litigation and absent overriding considerations, it should be as valid in criminal matters. It is of no moment that pretrial inspection is not constitutionally assured. *Cicenia v. Lagay*, 357 *U. S.* 504, 78 *S. Ct.* 1297, 2 *L. Ed.* 2d 1523 (1958). We are not limited to constitutional minima; rather we strive for practices which will best promote the quest for truth. It may be added that although *Cicenia v. Lagay* found the Fourteenth Amendment to be unoffended, yet it observed that 'it may be the "better practice" for the prosecution to comply with a request for inspection.' * * * It is difficult to understand why a defendant should be denied pretrial inspection of his own statement in the absence of circumstances affirmatively indicating disservice to the public interest." (28 *N. J.*, at *pp.* 136, 137).

Our highest court has consistently opened vistas to a more enlightened administration of criminal justice in this state. *Vide, e. g., State v. Mucci*, 25 *N. J.* 423 (1957); *State v. Hunt*, 25 *N. J.* 514 (1958); *State v. Mount*, 30 *N. J.* 195

(1959); *Aponte v. State*, 30 *N. J.* 441 (1959); *State v. Smith*, 32 *N. J.* 501 (1960).

In *Lowenstein v. Newark Board of Education*, 33 *N. J.* 277, 290 (1960), Justice Hall, speaking for a unanimous Supreme Court, said:

"What we have said has its roots much deeper than mere niceties of procedure or so-called technicalities of the law of evidence. The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law."

The liberty and freedom of these defendants are in jeopardy and they should be given every reasonable opportunity and facility within the rules for the preparation of their defense. *State v. Williamson*, 31 *N. J.* 16, 18 (1959).

 *R. R.* 3:5–10(c) gives the trial court discretionary power to allow inspection of documents in possession of others. The rule was designed to enable a defendant to adequately and efficiently prepare his defense in advance of trial. In the instant matter every consideration of justice and fairness dictates that defendants McNamara and Stevens be permitted to obtain a copy of their testimony and statements, if any, before the Commission.

 The court finds no merit in the Commission's contentions that the subpoena *duces tecum* is violative of an alleged sovereign immunity enjoyed by the Commission, or that the transcript of defendants' testimony have privilege from protection under the common law rules of evidence.

Our enlightened administration of criminal justice requires this court to deny the application of the Commission to quash the subpoena *duces tecum*.